IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION


SANDY HARPER,

        Plaintiff,

vs.                                 CASE NO. 1:09-cv-132-MP-GRJ

MICHAEL J. ASTRUE,
Commissioner of Social Security

        Defendant.

_____/


## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying her applications for a period of disability, disability insurance benefits ("DIB"), and supplemental security income benefits ("SSI"). (Doc. 1). The Commissioner has answered (Doc. 10), and both parties have filed briefs outlining their respective positions. (Docs. 14 and 19). For the reasons discussed below, the Court finds that the Commissioner's decision is due to be **AFFIRMED**.

## I. PROCEDURAL HISTORY

Plaintiff filed applications for DIB and SSI on January 6, 2004, alleging a disability onset date of October 29, 2003, because of depressive disorder, fibromyalgia, facet syndrome, anxiety, bilateral sciatica, and constant low back pain. (R. 94 -112). Plaintiff's applications were denied initially (R. 75) and upon reconsideration. (R. 80). Plaintiff requested a hearing before an administrative law judge (ALJ), who conducted a

hearing on January 17, 2007. On March 21, 2007, Administrative Law Judge Philemina M. Jones issued a decision unfavorable to Plaintiff. (R. 56-68). The Appeals Council denied Plaintiff's request for review, thus making the decision of the ALJ the final decision of the Commissioner. On June 3, 2009, Plaintiff filed the instant appeal to this Court of the Commissioner's final decision. (Doc. 1).

## II. <u>FINDINGS OF THE ALJ</u>

The ALJ made the following findings:

1. The claimant met the insured status requirements of the Social Security Act through December 31, 2003. (R. 58).

2. The claimant has not engaged in substantial gainful activity since October 29, 2003, the alleged onset date.

3. The claimant has the following severe combination of impairments: degenerative disc disease and an affective mood disorder.

4. The claimant does not have an impairment or combination of impairments that meets the listings.

5. The claimant has the residual functional capacity to lift up to 20 pounds occasionally, 10 pounds frequently, able to sit, stand and walk for six hours out of an eight hour day. Her depression resulted in mild restrictions in daily activities, social functioning, and moderate difficulties in maintaining concentration, persistence, or pace and she was able to perform simple routine repetitive tasks.

6. The claimant is unable to perform past relevant work.

7. The claimant was born on September 12, 1956, and was a younger individual, ages 45-49, on the date of onset.

**No. 1:09cv132-MP-GRJ**

8. The claimant has at least a high school education.[1]

9. The claimant has acquired work skills from past relevant work.

10. These work skills are transferable to other occupations existing in the national economy.

12. Thus, the claimant is not disabled.

The ALJ gave "a great deal of thought and carefully compared" Plaintiff's subjective complaints to other evidence in the record and concluded that Plaintiff's allegations of pain and limitation were "out of proportion" to the evidence and not fully credible. (R. 65). The ALJ found that the objective tests during the relevant time period (October 26, 2003, through December 31, 2003) did not support the level of intensity and degree of limitation described by Plaintiff. (R. 64-65). Plaintiff's back was diagnosed as chronic low back pain, treated at the Veterans Administration, and shown on MRI to be disc bulges at L4/5 and L5/S1, with minimal narrowing of neural foramina bilaterally, and no spinal stenosis. (R. 65). Plaintiff suffered a severe depressive episode for which she was admitted by Baker Act, but she left two days later and appeared to be well oriented and functioning normally at psychological evaluations since that time. (R. 65). She takes care of her personal needs and drives herself as

---

[1] There is some discrepancy about whether Plaintiff was a registered nurse or a nurse's assistant. In her brief, Plaintiff alleges that she had only a high school education and worked as a nurse's assistant. (Doc. 14, p. 2). The Commissioner asserts that she had several years of college and worked as a nurse, nurse's assistant, and nurse supervisor. (Doc. 19, p. 2). Plaintiff wrote in her application and elsewhere in the record that she was a critical care nurse and completed nursing school. (R. 105,110, 125-128). At the hearing she testified that she was a registered nurse and completed three years of nursing school and two years of college. (R. 948).

needed, which the ALJ noted requires a good deal of concentration, recall, remembering and carrying out of complex functions, and which involves a certain level of stress. (R. 65).

The ALJ gave controlling weight to the state agency physicians – who found Plaintiff was able to perform the exertional requirements of light work – because their opinions were consistent with the record as a whole, with the functional assessment submitted by the VA, and with the consultative examination by Dr. Chodosh. (R. 65). Some mild mental limitations were noted by the ALJ, which were not supported by the evidence when state agency physicians first made their mental assessments,. Further, the ALJ relied in part on Dr. Schoenrock's assessment for her finding that such limitations, though mild, do exist. (R. 66).

Based on the testimony of the vocational expert, the ALJ found that Plaintiff had work skills from her past relevant work, which were transferable to other occupations which exist in significant numbers in the national economy, such as cashier and ticket taker.

## III. ISSUES PRESENTED

Plaintiff argues that: (1) the ALJ erred in failing to articulate any reasons for discrediting the opinion of Dr. Depaz; (2) the ALJ erred in failing to consider the effect of Plaintiff's migraine headaches on her ability to work; (3) the ALJ did not accurately cite the limitations set forth in the Residual Functional Capacity dated December 2002 and upon which she relied to find Plaintiff capable of sedentary work, including

**No. 1:09cv132-MP-GRJ**

attributing the assessment to a doctor ; (4) the ALJ misstated the vocational expert's testimony to support her finding that Plaintiff could perform a number of semi-skilled jobs existing in the national economy; (5)  the ALJ applied the wrong Medical-Vocational Guideline Rule for Plaintiff's age group; and (6) the VE did not accurately identify DOT job listings that were consistent with the hypothetical posed by the ALJ.

## IV. <u>STANDARD OF REVIEW</u>

Title 42 U.S.C. § 405(g) sets forth the standard of review for this court.  The Commissioner's decision must be affirmed if it is supported by substantial evidence and the correct legal standards have been applied.  <u>Graham v. Apfel</u>, 129 F.3d 1420, 1422 (11th Cir. 1997).  Findings of fact by the Commissioner which are supported by substantial evidence are conclusive. 42 U.S.C. § 405(g). <u>Miles v. Chater</u>, 84 F.3d 1397, 1400 (11th Cir. 1996).  "Substantial evidence" has been defined to mean "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Foote v. Chater</u>, 67 F.3d 1553, 1560 (11th Cir. 1995) (citation omitted) (per curiam).  It is more than a scintilla, but less than a preponderance.  <u>Bloodsworth v. Heckler</u>, 703 F.2d 1233, 1239 (11th Cir. 1983) (citations omitted).  The court may not reweigh the evidence or substitute its judgment for that of the Commissioner.  <u>Wolfe v. Chater</u>, 86 F.3d 1072, 1076 (11th Cir. 1996).  It must determine only if substantial evidence supports the findings of the Commissioner.  <u>See</u> <u>Bridges v. Bowen</u>, 815 F.2d 622, 624 (11th Cir. 1987) (per curiam).  Even if substantial evidence exists which is contrary to the Commissioner's findings, where there is substantially supportive evidence of the

**No. 1:09cv132-MP-GRJ**

Commissioner's findings, the court cannot overturn them.  Barron v. Sullivan, 924 F.2d

227, 230 (11th Cir. 1991).  Unlike the deferential review accorded to the

Commissioner's findings of fact, his conclusions of law are not presumed valid. Martin

v. Sullivan, 894 F.2d 1520, 1529 (11th Cir. 1990) (citations omitted).  The

Commissioner's failure to apply correct legal standards or to provide the reviewing court

with an adequate basis for it to determine whether proper legal principles have been

observed requires reversal.  Id. (citations omitted).

 A disability is defined as an "inability to engage in any substantial gainful activity

by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months . . . ."  42 U.S.C. § 423(d)(1)(A).  To

qualify as a disability the physical or mental impairment must be so severe that claimant

is not only unable to do his previous work, "but cannot, considering his age, education,

and work experience, engage in any other kind of substantial gainful work which exists

in the national economy . . . ."  42 U.S.C. § 423(d)(2)(A).

 Pursuant to 20 C.F.R. § 404.1520(a)-(f), the Commissioner analyzes a claim in

five steps, commonly referred to as the "five step sequential analysis":

1.  Is the individual currently engaged in substantial gainful activity?

2.  Does the individual have any severe impairment?

3.  Does the individual have any severe impairments that meet or equal those
listed in Appendix 1 of 20 C.F.R. Part 404?

**No. 1:09cv132-MP-GRJ**

4.      Does the individual have any impairments which prevent past relevant work?

5.      Do the individual's impairments prevent any other work?

A finding of disability or no disability at any step renders further evaluation unnecessary.  Plaintiff bears the burden of establishing a severe impairment that keeps her from performing his past work.  If Plaintiff establishes that her impairment keeps her from her past work, the burden shifts to the Commissioner at step five to show the existence of other jobs in the national economy which, given Plaintiff's impairments, Plaintiff can perform.  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986); MacGregor v. Bowen, 786 F.2d 1050, 1052 (11th Cir. 1986).  If the Commissioner carries this burden, Plaintiff must prove that she cannot perform the work suggested by the Commissioner.  Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987).  It is within the district court's discretion to affirm, modify, or reverse a Commissioner's final decision with or without remand. 42 U.S.C. § 405(g); Myers v. Sullivan, 916 F.2d 659, 676 (11th Cir. 1990).

## V. SUMMARY OF RECORD EVIDENCE

### A.      Personal and Work History

Plaintiff was born on September 12, 1956, and was fifty years old at the time of the hearing.  (R. 947).  She had past relevant work as a critical care nurse.  (R. 948). She reported that she injured her back in 1997, when she lifted a patient working as an RN in critical care, for which she received a workers compensation settlement of $45,000.00 (after attorney's fees) in 1998 or 1999.   (R. 173, 950).  She tried working

**No. 1:09cv132-MP-GRJ**

several times in 2003 and 2004, but the longest attempt lasted approximately 4 weeks

without success because of pain.  (R. 949).

### B. __Medical History__

1. _Physical Impairments_

Plaintiff's primary treating source is the Veterans Administration in Lake City,

Florida.  (R. 225-871).  She brought an MRI dated July 17, 1998, to the VA in April

2001, which showed disc bulge at L3-4 and neural foramina encroachment at L3-4.  (R.

730).  The VA did their own testing which showed on April 9, 2001, minimal

degenerative changes in her cervical spine (R. 799) and a normal MRI of her lumbar

spine on May 24, 2001.  (R. 795).  An MRI done on June 18, 2003 showed "no

significant changes" from these earlier tests and only minimal disc bulging.  (R. 783-

784).  After an MRI was done in November 2004, which showed disc bulges with

minimal narrowing of neural foramina bilaterally, Plaintiff was referred to the Pain Clinic

in Tampa to manage her continued pain.  (R. 749-760).  Plaintiff finally agreed on

December 29, 2004, to attend the clinic (R. 313), which she began on February 17,

2005, and was discharged on March 4, 2005.  (R. 235-312).

Plaintiff's medical history is replete with frequent calls to her primary care

physician and visits to the emergency room requesting or demanding pain medication.

See e.g. (R. 644-645) (plaintiff called twice in one day and became abusive and

demanding); (R. 640-641) ("This pt. calls almost every day about med refills or comes

to ER."); (R.634) (patient demanding pain medications); see generally (R. 577, 571,

**No. 1:09cv132-MP-GRJ**

570, 569, 564-565, 558, 555, 545, 524, 519, 500, 497, 496, 490). She often demanded specific medications by name and refused alternatives that were offered to her. <u>See e.g.</u> (R. 721) (patient requesting morphine); (R. 727) (patient requesting Demerol); (R. 629) (patient demanding shot, refused Darvocet); (R. 577) (refused Toradol and Phenergan); (R. 555) (wants more Valium); (R. 545) (wants shot); (R. 424) (wants Xanax). When she was refused more drugs or increased dosages or early refills, she threatened legal action or that she would go to the ER instead or she would quit physical therapy or she would change primary care physicians. (R. 570, 524, 645).

Plaintiff was confronted in September 2002 about her substance abuse, which she denied. (R. 579-581). She was also brought to the VA Hospital on July 21, 2002, for a possible drug overdose, and had to be "Baker Acted" before she would be admitted. (R. 611-624). She left two days later. (R. 611-624). When her primary care physician began refusing or limiting her drug requests, she sought medical care from gynecological services at the VA on September 5, 2003, complaining that her primary care physician was not dispensing pain medication as the pain clinic suggested, and that the pain clinic thought her medications should be increased. (R. 479). When the gynecologist told her that the records did not support her representation, she had no reply. (R. 479).

It was only after her requests for narcotics were consistently and repeatedly denied – and she was told that her MRI results did not warrant any further pain medication for her back condition – that she appeared willing to attend the pain

**No. 1:09cv132-MP-GRJ**

management clinic in Tampa where she was taught different coping mechanisms for dealing with her lower back syndrome. (R. 318-479). The records from VA end in March 2005 after she was released from the Pain Clinic in Tampa.

A consultative examination by Dr. Depaz in July 2003, revealed no signs of inflammation, with decreased range of motion in the lumbar area, and his impression was "chronic myofacial mechanical back pain refractory to medications and multiple procedures." (R. 175). He also noted narcotic dependance, and history of affective psychosis and anxiety; menopausal syndrome, and allergies. (R. 175). His opinion was that her activity level would be "sedentary light with a 10 pound lifting limit with the ability to make position changes, as needed. These restrictions were given mainly secondary to her subjective complaints." (R. 175-176, 178-181).

Dr. Lance Chodosh examined Plaintiff on April 21, 2005, and found a full range of motion in her joints, a grossly normal motor function and that her gain and standing balance was normal. Dr. Chodosh's impression was "chronic low back pain of uncertain etiology; without physical evidence of significant impairment;" depression; and a "history of chronic headaches, under control by medication." (R. 875-881).

The latest note concerning Plaintiff's back condition is a letter from Dr. George Feussner dated September 25, 2006, with no accompanying treatment notes, in which Dr. Feussner opines that Plaintiff has "lumbar degenerative joint and disc disease with probable L5 root irritation." When the letter was written, however, Dr. Feussner did not

**No. 1:09cv132-MP-GRJ**

have past MRI results and planned to obtain them for further review before proceeding with decompression therapy (IDD).  (R. 924).

Two Physical RFC Assessments dated May 16, 2004, and August 27, 2004, found Plaintiff was capable of a full range of light work.  (R. 188-195, 217-224).

2. _Mental Impairments_

A psychological evaluation was done on July 27, 2003, by Dr. Schoenrock, who found Plaintiff to be depressed and suffering from chronic pain.  (R. 60-61).  Plaintiff reported to him that her only instance of mental health treatment was when she accidentally took an overdose of medication and was treated at Meridian as a suicide attempt in 2001, which she claimed was not a true attempt.  (R. 182).  Dr. Schoenrock found Plaintiff had an adequate capacity in understanding and memory; but she was compromised in her capacities for sustained concentration, persistence, social interaction, and adaptation.  (R. 183).  He assessed Plaintiff with no impairment in her ability to understand, remember, and carry out instructions; slight restrictions in her ability to interact appropriately with the public, supervisors and co-workers; and moderate restrictions in her ability to respond to work pressures in the work setting and to changes in work routine.  (R. 185-186).

Another mental status evaluation by Dr. Legume on June 8, 2004, found Plaintiff to have a major depressive disorder, pain disorder, with some paranoid thinking, and a GAF of 45-50 suggesting serious symptoms.  (R. 196-198).

**No. 1:09cv132-MP-GRJ**

Dr. Bernie Marrero, a Licensed Rehab Psychologist, examined Plaintiff on April 6, 2005, and found her to have a good to guarded prognosis depending upon her ability to adjust to stressors since she perceived herself as incapable of coping with pain and viewed herself as disabled.  He recommended mental health treatment at Meridian or the VA.  (R. 874).  He concluded that Plaintiff gave unreliable information (she said she was voluntarily admitted when she was admitted by Baker Act for mental health treatment), gave questionable optimal effort on the memory task and used a cane despite exhibiting no gait abnormalities.  (R. 872).

A Psychiatric Review Form dated July 26, 2004, disclosed only mild limitations; moderate insofar as difficulties in maintaining concentration, persistence and pace; and one episode of decompensation.  (R. 199-212). A second Psychiatric Review Form dated May 25, 2005, found her to be moderately limited in social functioning and in concentration, persistence and pace, but otherwise not limited.  (R. 882-894).

A Mental RFC, also dated July 26, 2004, found Plaintiff was able to follow simple directions, recall basic instruction, and perform simple tasks, as well as being able to drive and relate adequately to others.  (R. 213-216).  A second Mental RFC dated May 25, 2005, found Plaintiff moderately limited in the ability to complete a normal work week and to interact with the public and a supervisor, but otherwise not significantly limited in all other areas.  (R. 895-898).

3. *Summary of the testimony at the administrative hearing held 1/17/2007*

Plaintiff was 50 years old at the time of the hearing and was represented by

**No. 1:09cv132-MP-GRJ**

counsel. Ms. Elizabeth Stakenborg.  (R. 944).  Plaintiff drove approximately twice a week, but not long distances because she has sciatica in both legs from sitting and the car seat rubs against her back and hurts.  (R. 947-948).  She described her back condition as "two SI joints in my back dislocate frequently and they go out and hit the nerves.  And there's really nothing surgically they can do."  (R. 951).

The ALJ reminded Plaintiff that the relevant time period was from date of onset, October 29, 2003, through the date last insured, December 31, 2003.  (R. 951).  During the relevant time period Plaintiff was able to take care of her personal needs and attempted household chores.  (R. 952-953).  A typical day was described as, "I sat a lot. I walked a lot.  I laid down frequently, probably every one to two hours for a half an hour.  Took pain medication.  Walked my dog, if I could."  (R. 953).  She claims that she was hospitalized for mental health problems twice – once for three days in 2004 and again for ten days in 2005.  (R. 955).  Plaintiff claims that a VA doctor (Dr. Singh or Dr. Ziebooker) prescribed the use of a cane in 2003.  (R. 954, 965).  Prior to her date last insured ("DLI") she was able to sit and stand only 10 to 15 minutes at a time.  (R. 955-956).  By the time of the hearing, Methodone, Hydrocodone, and Vicodin had been added to her daily regimen.  (R. 958).  Even with these medications, Plaintiff stated that she can only sit or stand about ten or 15 minutes longer.  (R. 958).  Plaintiff stated that she can pick up a gallon of milk, and although she cannot bend or stoop, she can squat down to pick something up off the floor.  (R. 960-961).  Plaintiff claims that her

**No. 1:09cv132-MP-GRJ**

migraines were worse in 2003, before she was prescribed Methadone, and they were more frequent, about five or six a month.  (R. 961).

A vocational expert testified that if she were able to perform light work, she could do her past relevant work as a nurse supervisor or as a physician's office nurse or nurse consultant, which is sedentary work.  (R. 968-969).  If the same individual were limited to simple directions, basic instructions, and simple repetitive tasks, she would not be able to perform her past relevant work, but could perform work as a cashier or a ticket taker.  (R. 970).  If she were limited to avoiding contact with people, she would be limited to electronic assembler or mail clerk.  (R. 970).  If she were further limited slightly in her ability to interact appropriately with the public, supervisors, and co-workers, and moderately limited in her ability to respond to routine work settings, she could still perform work as a cashier, ticket taker, mail clerk and electronics worker.  (R. 971).  If she was limited to sedentary work, with a sit/stand option, and no work with violent patients, she could not perform past relevant work, but she still could be an information clerk or order taker.  (R. 972).

Counsel for the Plaintiff added to the hypothetical that the individual would have to take rest breaks lasting 15 to 30 minutes every hour for her back pain, with moderate restrictions in her ability to concentrate, and in her persistence and pace, moderate restrictions in her ability to respond to supervisors and co-workers, no crowds, no working with the public. The VE stated there would be no jobs she could perform because no job would allow a 15 to 30 minute break every hour.  (R. 972-973).  The

**No. 1:09cv132-MP-GRJ**

ALJ asked counsel where this limitation came from and she referenced a VA therapist's record dated December 11, 2002. (R. 973). The ALJ stated that this record concerned an earlier administrative decision that was in the record only for historical purposes. (R. 973). The attorney added to the hypothetical that Plaintiff would be able to stand or walk two hours out of an eight hour day, with a sit/stand option, and only able to sit less than six hours. (5r. 973-974). Counsel said these restrictions were noted by Dr. Depaz in July 2003. (R. 974). The VE responded that given such restrictions there would be no jobs that Plaintiff could perform. (R. 974).

## VI. <u>DISCUSSION</u>

### A.  <u>Dr. Depaz' Opinion and Plaintiff's RFC</u>

Plaintiff argues that the ALJ failed to follow Eleventh Circuit law when she did not specifically state the weight she was according to the opinion of Dr. Depaz. The cases cited by Plaintiff do not support this argument. <u>See e.g.</u>  <u>Sharfarz v. Bowen</u>, 825 F.2d 278, 279 (11th Cir. 1987)(reversed in part because ALJ accorded greater weight to non-examining physicians over treating physician); <u>Caulder v. Bowen</u>, 791 F.2d 872, 880 (11th Cir. 1986)(concerned weight accorded treating physician). Dr. Depaz is not a treating physician but rather was a consultative examiner and, as such, his opinion is not entitled to great or controlling weight. <u>See</u> 20 C.F.R. § 404.1527(d)(2); <u>see</u> <u>also</u> 20 CFR §404.1502 (a treating physician is medical source who has ongoing treatment relationship with claimant).

**No. 1:09cv132-MP-GRJ**

In the present case, the ALJ relied upon the voluminous records submitted by the VA, with whom Plaintiff had a long treatment history, which included a number of objective tests, and which the ALJ found supported her finding that Plaintiff's allegations of pain and limitation were "out of proportion and inconsistent with the medical evidence" and "not fully credible." (R. 59, 61, 65). Although the ALJ did not specifically discount Dr. Depaz' opinion, she noted that Dr. Depaz' functional assessments were "given mainly secondary to her [Plaintiff's] subjective complaints." (R. 60). The ALJ explained that she found more persuasive the RFC assessments of the State Agency physicians, an assessment completed at the VA on December 11, 2002, the assessment of Dr. Chodosh, and the findings of Dr. Feussner because their opinions were consistent with the record as a whole, which primarily consisted of the records from the VA.

Thus, the ALJ was not required to adopt the opinion of Dr. Depaz over the opinions of Plaintiff's treating physicians nor was she required to state with specificity what weight she was assigning Dr. Depaz' opinion since he was a consultative examiner, not a treating physician.

Included in this argument (but not necessarily related to the ALJ's assessment of Plaintiff's RFC or Dr. Depaz) is Plaintiff's contention that the ALJ misinterpreted an MRI conducted in November 2004, which the ALJ stated did not show any spinal stenosis. (R. 65). Plaintiff argues that the ALJ chose what she wanted to read from the report, which was the "Impressions" portion of the MRI that stated "[t]here is no spinal

**No. 1:09cv132-MP-GRJ**

stenosis," and ignored under the "Findings" portion of the report the notation "there is a

central spinal stenosis at this [L4/5] level." (R. 336). Plaintiff argues that this

inconsistency should have been resolved since the presence of spinal stenosis is in line

with Dr. Depaz' opinion that her pain was severe.[2]

The MRI does appear to contradict itself. However, the November 2004 MRI

was completed almost a year after Plaintiff's date last insured (December 31, 2003).

(See R. 56). The MRI taken prior to and closest to her DLI was conducted on June 18,

2003, and showed "mild posterior disc bulges and [sic] L4-5 and L5 S1, no significant

change compared to the MRI of 2001." (R. 784). The MRI done on May 24, 2001, was

"normal." (R. 795). Thus, the November 2004 MRI is irrelevant to whether or not she

was disabled prior to December 31, 2003, and any interpretation of it, whether accurate

or not, is immaterial.

### B. Plaintiff's migraine headaches

Plaintiff contends in her brief that her migraine headaches were severe in 2003,

occurring five to six times a month, and caused her to leave work. (Doc. 14, at pp. 15-

16; R. 962). Relying upon this statement Plaintiff claims it was error for the ALJ not to

find her headaches as a severe impairment during his step two analysis.

The Commissioner correctly points out that the ALJ considered Plaintiff's

migraine headaches, but found the condition not severe (R. 58) because the

headaches were treated successfully with medication. (R. 62, 876, 64, 961).

---

[2] Actually Dr. Depaz does not give an opinion as to the severity of Plaintiff's pain but rather only reported her subjective complaints of pain.

**No. 1:09cv132-MP-GRJ**

At step two the ALJ must determine if the claimant has any severe impairment. This step acts as a filter; if no severe impairment is shown the claim is denied, but the finding of any severe impairment, whether or not it qualifies as a disability and whether or not it results from a single severe impairment or a combination of impairments that together qualify as severe, is enough to satisfy the requirement of step two. Jamison v. Bowen, 814 F2d 585, 588 (11th Cir. 1987). In the present case, the ALJ found that Plaintiff had severe impairments of degenerative disc disease and an affective mood disorder. However, the ALJ went on to discuss a number of other conditions alleged by Plaintiff as causing her disability, including specifically, migraines (R. 58) in concluding that none of them singly or in combination precluded her from performing work at a light exertional level.

A diagnosis of a medical condition alone is insufficient; instead, Plaintiff must show the effect of the impairment on her ability to work. Wind v. Barnhart, 133 Fed.Appx. 684, 690 (11th Cir. 2005) quoting McCruter v. Bowen, 791 F.2d 1544, 1547 (11th Cir. 1986). While Plaintiff is correct that the medical evidence supports ongoing treatment for migraine headaches, her primary ongoing complaints concerned her back pain. Notably, migraines were not listed on her initial application as a basis for disability. (See R. 104). She received medication for migraine headaches throughout her treatment history, but only one specific incident was found where presumably the medication was not working when Plaintiff presented at the ER requesting Demerol for her migraine. (R. 497). It is, therefore, evident that the ALJ considered Plaintiff's

**No. 1:09cv132-MP-GRJ**

migraines in view of the fact that the ALJ  referenced this condition in her decision and

inquired at the hearing about it.  (R. 59-60, 62, 64, 961-962).  The medical evidence

referenced by the ALJ –  particularly the opinion of Dr. Chodosh –  noted that Plaintiff's

migraines were controlled by medication.  (R. 58).  Indeed, at the hearing Plaintiff

testified that her migraines were now controlled by Methadone, which recently had been

prescribed.  (R. 961).  Plaintiff also testified that even though the headaches were

worse during 2003, she only had to leave work "a couple of times."  (R. 962).

Accordingly, for these reasons, the Court concludes that there is substantial

evidence supporting the ALJ's conclusion that Plaintiff's migraine headaches were

controlled by medication and, therefore, the ALJ did not err by finding such conditions

are not severe or disabling.  See Jackson v. Astrue, 2008 WL 2368716, (11th Cir.),

citing Dawkins v. Bowen, 848 F.2d 1211, 1213 (11th Cir. 1988).

### C.  The ALJ's RFC finding and the December 2002 VA assessment

Plaintiff next argues that the ALJ erred when referring to and interpreting a 2002

functional assessment done at the VA in support of her RFC finding. According to

Plaintiff, the ALJ failed to adopt all of the report and attributed the assessment to a

doctor, when it was actually completed by a registered nurse.  (See R. 65).  The ALJ

referenced this assessment as support for her finding that Plaintiff was able to sit,

stand, and walk and lift and/or carry up to 20 pounds.  (R. 65).  Plaintiff argues that the

RN found numerous and significant other limitations that the ALJ ignored, such as:

Plaintiff only could stand for less than one hour in an eight hour workday; that she could

**No. 1:09cv132-MP-GRJ**

sit for less than one hour in an eight hour workday; that she could never stoop; reaching and pushing/pulling were affected by her low back condition; and that she was only able to stand and sit for limited periods of time without changing positions. (R. 551). The assessment was also made that Plaintiff required 15 to 30 minute rest periods during the day at least every hour.  (R. 550).

The ALJ's RFC assessment should be based upon all of the evidence concerning a claimant's ability to do work, and the opinions, diagnoses, and medical records of a treating physician are given controlling weight.  20 C.F.R. § 404.1545(a); Lewis v. Callahan, 125 F.3d 1436, 1440 (11th Cir.1997).  At the time this occupational assessment was done (December 2002), the objective tests of Plaintiff's lower back were all normal. Further, while Plaintiff's complaints to her primary care physicians of pain and limitation were increasing, Plaintiff's physicians were becoming more suspicious of substance abuse and drug seeking behaviors by Plaintiff.

As such, the ALJ was not required to adopt the entire assessment made by the VA nurse on December 11, 2002, in light of the medical record as a whole because those portions of the assessment not adopted by the ALJ were inconsistent with the objective tests and the evidence of possible substance abuse and drug seeking.

### D.  The ALJ's Step Five Analysis

Plaintiff contends there were a number of errors with the ALJ's step five analysis resulting in her failure to carry the Commissioner's burden of proof that there are a significant number of jobs in the national economy that Plaintiff can still perform.

**No. 1:09cv132-MP-GRJ**

Plaintiff first argues that the ALJ utilized the wrong Medical-Vocational Guideline Rule 202.22, (the "grids"), which applies to individuals ages 18 to 44,[3] because she was 50 at the time of the hearing.   The Commissioner concedes that Rule 202.15 was the applicable rule based upon Plaintiff's age, but points out that both Rules 202.22 and 202.15 direct a finding of "not disabled" for individuals capable of doing light work, either skilled, semi-skilled or unskilled, either transferable or untransferable.  20 CFR Pt. 404, Subpt. P, App.2, Table No. 2, p. 596.   Further, any error with regard to use of the "grids" is immaterial since the ALJ relied upon the testimony of a vocational expert and only used the "grids" as a framework for her decision. See Sutton v. Astrue, No. ED CV 08-1659-PJW, 2010 WL 701562 (C.D. Cal. Feb. 25, 2010) (ALJ's use of wrong grid rule does not require reversal when decision was based on vocational expert testimony and grids were only a framework for decision).

Finally, Plaintiff argues that the vocational expert identified jobs that involved more than simple, repetitive tasks, a limitation included in the hypothetical posed by the ALJ, and which conflicted with the Dictionary of Occupational Titles (DOT).  Specifically, the VE identified cashier and ticket taker as jobs Plaintiff could perform which require reasoning levels of three and two respectively, according to the DOT.  A reasoning level of two or higher assumes that the applicant is capable of more than simple or repetitive tasks. DOT, Vo. 11, 4th Ed. at 1011. Thus, in this regard there is an inconsistency between the DOT listing and the vocational expert's testimony.

---

[3]  The Commissioner is correct that Rule 202.22 applies to "younger individuals" denoted as 18 through 49.  20 CFR Pt. 404, Subpt. P, App.2, p. 593.

No. 1:09cv132-MP-GRJ

The inconsistency, however, does not require reversal under current Eleventh Circuit law. When, as here, there is an inconsistency between the opinion of a VE and the DOT – and the ALJ is not made aware of the inconsistency – the ALJ may properly rely on the testimony of the VE to satisfy the burden of proof at step five, even though SSR-00-4p requires the ALJ to resolve the inconsistency., Miller v. Commissioner of Social Security, 246 Fed.Appx. 660, 662, 2007 WL 2461771 (11th Cir. 2007). While SSR-00-04p provides that "neither the DOT nor the [VE] evidence automatically 'trumps' when there is a conflict," that ruling is only binding on the administration and do not bind the courts. The prevailing view in the Eleventh Circuit is that the testimony of a vocational expert "trumps" an inconsistent provision of the DOT. Id., citing Jones v. Apfel, 190 F.3d 1224, 1229-30 (11th Cir. 1999). Under SSR-00-4p the ALJ is obligated to inquire of the expert if there is a conflict – and only if a conflict is identified – is the ALJ required to address it. Nothing in the ruling, however, requires an ALJ independently to investigate whether a conflict exists or whether the vocational expert is correct. Kelley v. Astrue, no. 5:08-cv-5-Oc-GRJ, 2009 WL 2731341 (M.D. Fla. Aug. 26, 2009), citing Jones supra and Miller supra. This is the view of the other circuits that have addressed the issue. Martin v. Commissioner of Social Security, 170 Fed. Appx. 369, 2006 WL 509393, at *4-5 (6th Cir. 2006); Haas v. Barnhart, 91 Fed. Appx. 942, 947-48 (5th Cir. 2004); Gibbons v. Barnhart, 85 Fed. Appx. 88, 93 (10th Cir. 2003).

In the present case, as required, at the beginning of the questioning the ALJ specifically asked the vocational expert to make her aware of any inconsistencies

**No. 1:09cv132-MP-GRJ**

between his testimony and the DOT. (R. 967). None were noted. Because the ALJ was not made aware of the inconsistency at the hearing, the ALJ was entitle to rely upon the opinion of the VE, which under controlling Eleventh Circuit law, trumps any inconsistency with the DOT.

In sum, it was not reversible error for the ALJ to cite the wrong Medical-Vocational Guideline rule when the correct rule would have resulted in the same finding that Plaintiff was not disabled. Further, because no inconsistencies were brought to the attention of the VE, it was not reversible error that the ALJ relied upon the testimony of the vocational expert, even though there may have been some inconsistency between the VE's testimony and the DOT.

## VI. RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner be **AFFIRMED**.

**IN CHAMBERS** in Gainesville, Florida, on September 30 , 2010.

*s/ Gary R. Jones*

GARY R. JONES
United States Magistrate Judge

## NOTICE TO THE PARTIES

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation. A party may respond to another party's objections within 14 days after being served with a copy thereof. Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**

**No. 1:09cv132-MP-GRJ**